LOY v. ALSTON et al.

ALSTON v. LOY.

(Circuit Court of Appeals, Eighth Circuit.   July 12, 1909.)

Nos. 2,972, 3,005.

1. MINES AND MINERALS (§§ 97, 100*)—MINING PARTNERSHIPS—HOW FORMED —CONVEYANCE BY ONE PARTNER DOES NOT DISSOLVE.

Mining partnerships may be formed (1) by the customary agreement of partnership, or (2) by the operation of a mine by some of the joint owners with the consent or acquiescence of the other joint owners.

The conveyance by one joint owner of his interest in the mine to a stranger does not dissolve the partnership in its operation; but the grantee becomes a partner in the place of the grantor, who ceases to be a member of the partnership.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 222– 225; Dec. Dig. §§ 97, 100.*

Mining partnerships, see note to G. V. B. Min. Co. v. First Nat. Bank of Hailey, 35 C. C. A. 515.]

2. PARTNERSHIP (§ 87*)—WRONGFUL EXCLUSION OF MAJOR OWNER FROM PART-NERSHIP BY AGREEMENT BARS ENFORCEMENT OF CONTRIBUTION FOR SUB-SEQUENT LOSSES.

A partner, who, in violation of a stipulation of a partnership agreement to the effect that the owner of the major interest should superintend and control the conduct of its business, excludes him therefrom, and there-after incurs losses by his own management of the partnership business, may not recover any share of them from the excluded owner.

[Ed. Note.—For other cases, see Partnership, Cent. Dig. § 135; Dec. Dig. § 87.*]

3. COURTS (§ 264*)—FEDERAL COURTS—DEPENDENT BILL—NEITHER DIVERSITY OF CITIZENSHIP NOR FEDERAL QUESTION REQUISITE TO JURISDICTION.

A bill in equity dependent upon a former action, of which the federal court had jurisdiction, may be maintained in a national court, in the ab-sence of diversity of citizenship and of a federal question: (1) To aid, enjoin, or regulate the original suit; (2) to restrain, avoid, explain, or enforce the judgment or decree therein; or (3) to enforce or obtain an adjudication of liens upon or claims to property in the custody of the court in the original suit.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 801; Dec. Dig. § 264.*]

4. ESTOPPEL (§ 68*)—INCONSISTENT POSITIONS—RECOVERY OF DAMAGES FOR MAKING NOTE ESTOPS FROM DEFEATING ITS COLLECTION.

One who has recovered damages on the ground that he has been induc-ed by fraud to make himself liable to pay a promissory note is estopped from successfully invoking the maxim, "He who comes into equity must come with clean hands," to defeat the subsequent collection of the note in equity.

[Ed. Note.—For other cases, see Estoppel, Dec. Dig. § 68.*]

5. JUDGMENT (§ 883*)—OFFSETTING JUDGMENTS—EQUITY HAS JURISDICTION— REMEDY AT LAW INADEQUATE—A JUDGMENT DEBTOR NONRESIDENT.

Courts of equity have original jurisdiction to offset judgments between the same parties.

Where one of the judgment debtors is a nonresident without leviable property in the jurisdiction, the remedy at law is not as prompt, efficient, and adequate as a decree of offset in equity.

[Ed. Note.—For other cases, see Judgment, Dec. Dig. § 883.*]

**6.** APPEAL AND ERROR (§ 934*)—RECITAL IN DECREE OF AGREEMENT OF PARTIES PRESUMABLY TRUE.

A chancellor's recital in a decree that by agreement of parties in open court a certain relief was adjudged is presumptively correct, and, in the absence of any evidence to the contrary, it must prevail.

[Ed. Note.—For other cases, see Appeal and Error, Dec. Dig. § 934.*]

**7.** EXECUTION (§ 156*)—COSTS OF LAWFUL LEVY DURING STAY PAYABLE BY JUDGMENT DEBTOR.

Where the enforcement of a levy upon property is stayed until the final hearing of a suit in equity while the security of the levy is preserved, and at the final hearing it is found that the judgment debtor must pay some part of the amount unpaid on the judgment, that debtor is liable for the costs of guarding and holding the property levied upon during the stay.

[Ed. Note.—For other cases, see Execution, Dec. Dig. § 156.*]

**8.** APPEAL AND ERROR (§ 461*)—RELEASE OF LEVY BEFORE PAYMENT OF JUDGMENT, ERROR.

An order of the court, made after an appeal from such a decree, and before the determination of the case on the appeal, to the effect that the levy be released, is error, because the bond on appeal was not conditioned to pay the judgment in case the appeal failed.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 2235 2238; Dec. Dig. § 461.*]

(Syllabus by the Court.)

Appeal from the Circuit Court of the United States for the Western District of Missouri.

H. H. Bloss and John T. Harding, for D. B. Loy.

Ralph E. Scofield (John L. McNatt, on the briefs), for W. W. Alston and E. R. Durham, U. S. Marshal.

Before SANBORN and VAN DEVANTER, Circuit Judges, and POLLOCK, District Judge.

SANBORN, Circuit Judge. On June 29, 1906, W. W. Alston recovered a judgment in the court below for $6,500 and costs against D. B. Loy and L. A. Tooker, on account of fraudulent representations, which induced him to buy three-ninths of a mining lease in January and two-ninths of the same mining lease in April, 1905. He purchased the two-ninths of Loy, who was the cashier of the Miners' & Merchants' Bank of Aurora, and at the time of that purchase he and Tooker gave their note to that bank for $2,667, the proceeds of which were used either to pay for the interest purchased in the mine or for an interest purchased in a mill and mining plant, or for both. Tooker et al. v. Alston, 86 C. C. A. 425, 428, 159 Fed. 599, 602, 16 L. R. A. (N. S.) 818.

On December 8, 1906, the bank recovered a judgment against Alston in the circuit court of Jasper county in the state of Missouri, for $1,595.85, on account of the balance due on this note. In March, 1907, this judgment was assigned to Loy, and on April 28, 1908, there remained $817.75 and some interest owing upon this judgment. On that day Loy exhibited his bill in this court, in which he alleged that Alston owed him $3,034.45 on account of a partnership transaction between them and $835.35 on account of the bank judgment, that he had tendered and offered to pay to Alston the difference

between the aggregate of these amounts and the amount of Alston's judgment against him, that Alston was not a resident of the state of Missouri and was insolvent, and he prayed that the amount which Alston owed him might be credited upon Alston's judgment against him in the court below, and that Alston might be enjoined from enforcing that judgment. Upon the payment by Loy of $3,300, the difference between the aggregate amount of Alston's alleged indebtedness to him and the amount due on the judgment against Loy, the court below issued a temporary injunction against the collection of the remainder of Alston's judgment, and the suit then proceeded to final hearing, whereupon the court rendered a decree to the effect that Alston owed Loy nothing on account of the alleged partnership, that the $817.75 unpaid on the bank judgment be credited upon the judgment against Loy, that by agreement of the parties in open court Alston should make no further claim against the bank or its sureties on account of a certain attachment, and that Alston should pay the costs and expenses which had accrued upon a levy of an execution which he had caused to be made under his judgment against Loy. From this decree both parties have appealed, Loy because the court failed to allow him the amount which he claimed on account of the alleged partnership, and Alston because the court compelled him to credit Loy with the amount owing upon the bank judgment, deprived him of the costs accrued on his execution, and by an order made after the decree released his levy thereunder.

The claim of Loy is that he, Alston, and L. A. Tooker were partners operating the mining lease, five-ninths of which he and Tooker had induced Alston by fraud to buy, from January, 1905, until March, 1907, that this operation resulted in a loss of $4,184.06, which he paid, and that Alston owes him five-ninths of this amount, or $2,324.

A mining partnership differs in some respects from the ordinary commercial partnership. It may be formed, continued, and dissolved in either of two methods, (1) by the usual partnership agreement, or (2) by the joint ownership of undivided parts in a mine or lease, and by the operation of a mine or lease by some of the joint owners with the consent or acquiescence of the other joint owners. A commercial partnership is dissolved when one of the partners disposes of his interest, but a mining partnership, which results from the operation of a mine by some of the joint owners with the consent of the others, is not dissolved by the conveyance by one of these owners of his interest in the mine or the lease to a stranger; but the grantor then ceases to be a member of the copartnership, and the stranger becomes a partner in his place. The delectus personæ which is an essential element of an ordinary partnership is not an indispensable attribute of a mining partnership. Bissel v. Foss, 114 U. S. 252, 261, 5 Sup. Ct. 851, 29 L. Ed. 126; Snyder on Mines, §§ 1575, 1581; Taylor v. Castle, 42 Cal. 367, 370; Nisbet v. Nash, 52 Cal. 540; Charles v. Eshleman, 5 Colo. 107, 111.

The entire loss in the conduct of the partnership here in question occurred between January, 1906, and March 11, 1907, and Loy insists that he and Alston were then partners, both by virtue of his ownership of two-ninths of the mine during that time and also by virtue of an

agreement of partnership between them. Was Loy a partner of Alston by virtue of his ownership of two-ninths of the mine during this time? Loy, Tooker, and Reed each owned three-ninths of the mining lease in January, 1905. They sold and Reed conveyed his three-ninths of this lease to Alston during that month. On April 13, 1905, Loy conveyed two-ninths of the lease to Alston and one-ninth of it to Tooker by the same writing, so that he parted with his entire interest by a single conveyance. On May 4, 1905, Tooker conveyed his four-ninths to his son Harry Tooker, and on December 11, 1905, Loy conveyed two-ninths of this lease to one Olney. These conveyances were all in writing and properly executed, and there are no other conveyances of any interest in the mine in evidence. The necessary result is that Loy parted with his entire interest in the lease in April, 1905. He then ceased to be a partner by virtue of any ownership in the lease, and Tooker and Alston became the sole owners and partners, and he never thereafter acquired any title whatever to any interest in the lease or in the mine. It is true, as counsel declare, that Loy and Tooker testified that there was an understanding that Loy should have Tooker's interest until the latter paid for it, and that he never did so. It is also true that Loy and the Tookers testified that Harry Tooker turned back to L. A. Tooker, and the latter turned back to Loy, two-ninths, or some other indefinite interest, in the lease after the conveyances to them had been made; but this testimony was the only evidence that Loy ever had any right or title to an interest in the lease after April 13, 1905, and it is clearly insufficient to overcome these indisputable facts: The recorded title was in others ever after April 13, 1905. Loy and Tooker induced Alston to purchase of Loy the two-ninths which he bought on that day by the representation that Tooker was buying Loy's other one-ninth and that the conveyance which Loy then gave to them eliminated him from the partnership and gave Alston the ownership of a majority interest in and the control of the lease, and Loy is estopped by that representation from denying that these were the facts. The understandings and parol agreements of Loy and the Tookers relating to reconveyances of interests in the lease were ineffective and are negligible because no interest therein could "be assigned, granted or surrendered unless it be by deed or note in writing." Rev. St. Mo. 1899, § 3415 (Ann. St. 1906, p. 1949). And if Loy ever had obtained two-ninths from the Tookers after he conveyed away all his interest in April, 1905, he conveyed that two-ninths to Olney in December of that year, and the loss in the operation of the mine did not occur until after January, 1906. Loy was not therefore a partner of Alston by virtue of any joint ownership with him in the lease during the time when the loss occurred.

Was Loy a partner of Alston by virtue of any agreement of partnership? In April or May, 1905, at or soon after the time when Loy conveyed all his interest in the mine to Alston and Tooker, the latter agreed, and Loy knew of this agreement at the time, that Alston, who thereby acquired a major interest in the lease, should control, and his brother, N. F. Alston, should superintend all the mining operations under it. Pursuant to this agreement, N. F. Alston did superintend the working of the mine from that time until about the 1st of January,

1906. He deposited the moneys which he derived from the mine in the bank of which Loy was the cashier. By January, 1906, he had derived a profit of $2,388.50 from the operation of the mine, and he had a larger amount on deposit to his credit in the bank out of which he had been in the habit of drawing money by his checks to pay his laborers and the other expenses of operation. Thereupon, about the 1st of January, 1906, Loy refused to let the bank pay Alston's checks, ordered the lessor company not to pay the lessee's share of the income derived from the operation to Alston, and put one Wheat, Loy's brother-in-law, in control of the operation of the mine in the place of N. F. Alston, the superintendent. There was some evidence that prior to this time N. F. Alston had consulted and agreed with Loy and Tooker about the operation of the mine; but neither he nor W. W. Alston ever consented or agreed to his removal as superintendent, or to the management or control of the mining operation under the lease by Loy or Wheat. W. W. Alston testified that Loy never was his partner, and that he never made any agreement of partnership with him, and the evidence upon the issue of an agreement of partnership between Alston and Loy is not so clear and persuasive as to overcome the presumption that the finding of the chancellor below upon this issue was right. Moreover, if there ever was a partnership between them by agreement, the most important term of that contract was that W. W. Alston should have the control and N. F. Alston should be the superintendent of the operation of the mine. Loy defiantly violated that stipulation in January, 1906, and he was in no position thereafter to enforce the contract of partnership. After he had removed N. F. Alston and placed his brother-in-law in control, he incurred and paid debts in the operation of the mine to the amount of $4,184.06 above the income which he derived from it; but these debts were incurred without the knowledge or consent of W. W. Alston and in violation of his partnership agreement. "A court of equity acts only upon the conscience of a party. If he has done nothing that taints it, no demand can attach upon it so as to give any jurisdiction." No rule of law, or of equity, or of morals, required Alston to pay any part of these debts, and the court below rightly refused to allow Loy any credit upon the judgment against him on account of them. The appeal of Loy cannot be sustained.

We turn to the appeal of Alston. His counsel assail the decree on many grounds. They contend that the court below had no jurisdiction of this suit because L. A. Tooker, who was named as a defendant herein, but was never served with a subpœna, was a citizen of the same state as the complainant Loy and was a necessary party to the accounting of the affairs of the alleged copartnership. But this suit is based upon a dependent bill exhibited to restrain the enforcement of a judgment of the court below to which Loy, Alston and Tooker were parties, until the complainant's equitable right to a credit of the amount of the claims in his favor could be determined, and neither diversity of citizenship nor a federal question is indispensable to jurisdiction of such a suit. A bill in equity dependent upon a former action of which the federal court had jurisdiction may be maintained in a national court in the absence of both these attributes: (1) To aid, en-

join, or regulate the original suit; (2) to restrain, avoid, explain, or enforce the judgment or decree therein; (3) or to enforce or obtain an adjudication of liens upon or claims to property in the custody of the court in the original suit. Campbell v. Golden Cycle Min. Co., 73 C. C. A. 260, 262, 263, 141 Fed. 610, 612, 613; Brun v. Mann, 80 C. C. A. 513, 518, 151 Fed. 145, 150, 12 L. R. A. (N. S.) 154.

Again, Tooker was not an indispensable party to this suit because he was not a necessary party to Loy's claim for a credit of the bank judgment, even if he was such to the claim for an accounting of the affairs of the alleged partnership, and as there was no such partnership the suit was properly maintained in his absence.

Counsel for Alston invoke the maxim, "He who comes into equity must come with clean hands," and contend that Loy is entitled to no relief in this suit because he fraudulently induced Alston to give the note on which the bank judgment was founded to enable him to borrow money to pay Loy for his interest in the mining lease. For what purpose Alston borrowed the money he obtained upon this note, and how he actually used it, is not definitely shown by the evidence. Probably a portion of it was applied to the payment of the purchase price for Loy's interest in a mining lease, and a portion of it was used to pay for an interest in a mill which Alston bought of Loy. There is no substantial evidence in this case that the portion of the note which was given for money to pay for the mill was obtained by fraud, and there is therefore no defense in this suit to that part of the note. When Alston discovered that he had been fraudulently induced to give the other part of the note which he made to borrow money to pay for an interest in the lease which he bought of Loy, he had a choice of remedies. He might have rescinded the purchase and have recovered back the consideration which he had paid, including a release of that part of the note applicable thereto if the bank held it with notice of the fraud as is claimed, or he could have affirmed the sale and the note and have recovered the difference between the value of the interest in the lease as it was and its value as Loy represented it to be. He made his election. He chose the latter alternative, and he has recovered his judgment for $6,500, on the ground that his entire note was valid, and that he would be obliged to pay it. In this state of the case, he cannot be permitted to recover of Loy upon this judgment on the ground that his note is valid, and that he is liable to pay it and to defeat Loy's collection of this note in this suit in the same court on the ground that this note, or a part of it, is void, and he is not liable to pay it. A court of equity will not tolerate and sustain positions so inconsistent. In this suit Loy is estopped, by his affirmance of and recovery on account of his note in the former action, from here invoking the rule, "He who does iniquity cannot have equity," to defeat its collection.

Another objection to this suit is that Alston is solvent, and Loy has an adequate remedy at law; but these judgments are in the state of Missouri. Alston is a resident and citizen of North Carolina, and Loy of Missouri. There is no evidence that Alston has any property subject to execution in the latter state, and the marshal failed to find sufficient to pay the judgment against him when he had an execution

in his hands for that purpose. Courts of equity have long possessed and exercised the power to order judgments between the same parties to be set off each against the other where a multiplicity of suits will be avoided or justice will be promoted by the pursuit of such a course. Black on Judgments, §§ 1000, 1001. If the court below should decline to grant relief in this suit, the complainant must pay the amount due upon the judgment against him, and then bring another action at law in North Carolina upon his Missouri judgment and collect the judgment he may recover in that action in North Carolina by a subsequent execution or other process issued in that state. This remedy is not as prompt, efficient, and adequate as the simple decree of this court that Alston shall credit on the judgment it has rendered in his favor the amount due to Loy on the judgment against Alston in the state court. Sowles v. Witters (C. C.) 40 Fed. 413.

Authorities are cited in support of the proposition that a court of equity may not compel the credit of one judgment upon another unless the former is final, and it is said that the decree below is erroneous because there was an appeal pending on the judgment in the Jasper county court; but the pleadings and the records have been searched in vain for any averment or evidence introduced at the hearing upon this issue of an appeal. It is true that, in an affidavit of N. F. Alston made and used on an application for a preliminary injunction, a statement may be found that such an appeal was pending on April 27, 1908; but that affidavit was never introduced in evidence at the hearing of this case, and the statement which it contained was not proved in any way, nor was it in issue. Upon the evidence no appeal had been taken from the judgment of the Jasper county court, and it was final. There was therefore no error in that part of the decree which adjudged that Alston should allow a credit of $875.75 upon his judgment as of December 8, 1906.

There is a paragraph in the decree here in issue which reads in this way:

"And by agreement of parties in open court, it is hereby decreed that said W. W. Alston shall make no further claim against the Miners' & Merchants' Bank of Aurora, Mo., or against any surety for said bank on or by reason of an attachment in a state court, and said claim or claims are fully canceled."

This paragraph is assailed on the ground that there was no such agreement, and that under section 720, Rev. St. (U. S. Comp. St. 1901, p. 581), the federal courts may not stay proceedings in a court of a state except in bankruptcy cases; but as the recital of the chancellor that the agreement he specifies was made by the parties in open court is presumptively true, and there is no proof or evidence to the contrary in the record, it must prevail. There is no provision in the decree which in any way enjoins or stays any proceedings in any state court. The entire effect of this paragraph is to cancel and release, pursuant to the agreement of the parties, certain claims of Alston which, so far as this record discloses, were not in suit in any court.

Finally, counsel for Alston specify as errors a paragraph of the decree to the effect that he shall pay all the costs and expenses for guarding, protecting, and caring for the property levied upon under his judgment and an order made on July 25, 1908, about a month

after the decree was rendered, to the effect that the mill property involved in this litigation be released from the levy under that judgment because, as the court recited in the order, Loy's appeal bond protected Alston in case the decree below should be affirmed. These specifications are well made. Under his judgment Alston had the legal right to levy his execution on the property of Loy and to hold that levy and the property seized thereunder as security for his judgment until it was fully paid. The temporary injunction stayed proceedings under this levy, but it expressly provided that any levy of an execution was not discharged thereby, but should continue in force and effect if the temporary injunction should be dissolved. Inasmuch as it appeared at the hearing that the complainant tendered and paid into court several thousand dollars less than Alston was entitled to receive, the temporary injunction should have ceased at the final hearing when this fact was found, and Alston should have recovered the necessary costs and expenses of holding the property under his levy until the amount justly due him was paid.

Again, Loy's bond on appeal was conditioned to pay all damages and costs if he failed to make good his plea; but damages resulting from the release of Alston's levy and the loss of the security thereof were not the effect of the appeal, because Loy had the right to maintain the levy notwithstanding the appeal until his judgment was fully paid. The appeal bond was not conditioned that Loy would pay the judgment if his plea was not sustained. Therefore the order of July 25, 1908, which released Alston's levy, was erroneous. it must be reversed, and the levy and its liens must be restored and maintained until the amount owing on Alston's judgment is paid.

As against the appeal of Loy, the decree below must be affirmed.

As against the appeal of Alston, the decree below and the order of July 25, 1908, must be reversed, and the case must be remanded to the court below. with instructions to enter a decree to the same effect as that heretofore rendered, except that it shall not require Alston to pay, but shall adjudge Loy liable to pay. the necessary costs and expenses of holding, guarding. and protecting the property levied upon under the execution upon his judgment against Loy, and shall adjudge that the temporary injunction cease and no longer have effect, that Loy satisfy and release the bank judgment against Alston, that the levy canceled and released by the order of July 25, 1908, be reinstated and restored to the same effect as though it had not been released, and that, unless within 30 days after the rendition of the decree the complainant Loy pays the amount found due Alston by the decree, the marshal may proceed, if so directed by Alston, to sell all the interest which the defendants named in Alston's judgment against Loy and Tooker had at the date of the levy in the property levied upon under that judgment to satisfy and pay the amount adjudged due Alston by said decree, and that Alston recover the costs of this suit to be taxed by the clerk; and it is so ordered.