### NATIONAL SHAWMUT BANK OF BOSTON v. TOPAS et al.

No. 2687.

Circuit Court of Appeals, First Circuit.

July 20, 1932.

Thomas Hunt, of Boston, Mass. (James C. Reilly and Gaston, Snow, Saltonstall & Hunt, all of Boston, Mass., on the brief), for appellant.

Stuart Rand, of Boston, Mass. (Richard Wait, of Boston, Mass., and Maurice Leon, of New York City, on the brief), for appellees.

Before BINGHAM, WILSON, and MORTON, Circuit Judges.

WILSON, Circuit Judge.

This is an appeal from a decree of the District Court of Massachusetts in a bill in equity brought by the appellees to trace and recover funds alleged to be charged with a trust in favor of the appellees and now in the hands of the appellant.

The District Court held that the appellant received the funds with notice of their character, and the appellees were entitled to recover them.

The facts are as follows:

John MacGregor Grant, Inc., was incorporated in 1916, and took over the business of John MacGregor Grant, who was engaged in foreign trade, chiefly with Russia. Upon incorporation, one John Bolinger, a director in one of the New York banks, with which Grant did business, and a personal friend of Grant, became a director of the John MacGregor Grant, Inc.

In August, 1917, Bolinger came to Boston and became a director and vice president of the National Shawmut Bank of Boston, the appellant, and took charge of its foreign business. He brought with him the account of Grant, Inc., as the corporation will be hereinafter termed. A loan of $200,000 was immediately granted Grant, Inc. In addition to its loan the appellee bought sight drafts of Grant, Inc. At the close of 1917 it owed two New York banks and the appellee approximately $1,000,000, and had a claim against the Soviet government, which had confiscated certain property of Grant, Inc., to the amount of $2,000,000; but the collection of this claim could not be enforced unless the United States should recognize the Soviet government, which it has never done. The banks in 1917, following the confiscation by the Soviet government, decided that the wisest course to pursue was to permit the corporation to continue, and its officials, who had an intimate knowledge of Russian affairs, to work out the problem of realizing on its Russian claims.

This was clearly good judgment, as Grant, Inc., reduced its indebtedness to the appellant from $100,000 on November 12, 1917, to $21,564.08 on January 1, 1921, having after the confiscation of its property by the Soviet government made the following payments:

August 12, 1918 ................$31,377.09
February 10, 1919 .............. 18,373.62
May 12, 1919 .................. 7,121.14
May 10, 1920 .................. 21,564.07

These sums apparently came from gradually realizing on its foreign business. From May, 1920, up to January, 1922, no further substantial sums were received from this source. Unquestionably Grant, Inc., from 1917 to 1922 was insolvent, in the sense that it had not the available means of meeting its indebtedness. In May, 1921, Grant, Inc., was without available funds for thirty days or more even to meet a small claim of the appellee to the amount of $445. This, Bolinger as a director of the corporation and from attendance at the meetings of its board of directors and from conferences with Grant with reference to the claim of the appellee, knew.

It is admitted that Bolinger, who was responsible in securing the business of Grant, Inc., for the appellee, and the extending of the credit, kept in close touch with the affairs of Grant, Inc., and was pressing at every opportunity for the payment of the balance due; but knew that until a further sum was realized on its foreign business nothing more could be paid by Grant, Inc.

In January, 1921, in response to a letter of Bolinger, saying that the appellee could not, under the ruling of the Federal Reserve Board, again renew Grant, Inc.'s, loan, its vice president wrote as to its financial condition and its prospects as follows:

"New York January 19, 1921

"The National Shawmut Bank of Boston, Boston, Massachusetts. Attention Mr. John

Bolinger. Dear Sirs: In reply to your favor of the 18th inst. we beg to say that it will be impossible for us to pay the acceptance maturing on February 7th amounting to $21,564.08.

"In this connection we may say that we are communicating with Russia with a view of having the Russian authorities settle our claim with reference to the indebtedness of the Aksai Corporation, for whose account the merchandise, covering the above acceptance as collateral, was bought. Particularly are we trying to have payment arranged for the merchandise that we are holding here for the Aksai Corporation amounting to over $80,000.00, and we have reasonable hopes of being successful in this undertaking, the idea being to ship these goods to Russia.

"As you will recollect the original acceptance was over $40,000.00, of which $20,000.00 was paid by us last May, leaving the above amount. This is to illustrate only that we are gradually paying off the obligations that have grown out of our Russian transactions, which unfortunately have been delayed in settlement owing to political events.

"We have with other banks similar obligations outstanding and these banks have and are showing leniency in regard to redemption of same, taking into consideration the unusual political circumstances that have prevented us from meeting our obligations through no fault of ours.

"At the present time the Russian situation seems to hold out promises that are more favorable than at any time since the Russian Bolshevik upheaval, and we are certainly doing all in our power to straighten out our Russian claims and we are reasonably sure that something will develop in the not distant future that will cover all our obligations including the drafts negotiated through you, amounting to very much more than the above acceptance.

"In view of the above we trust that you will be as considerate as, for instance, the Guaranty Trust Company of New York, who are renewing our loans similarly covered as your acceptance by merchandise, and have same renewed, or, if impossible under the rulings of the Federal Reserve Board, you may find your way clear to transfer the acceptance into a demand loan.

"Yours very truly,
"JMG:DC      C. A. Holstein,
             Vice-President."

In December, at the insistence of the Federal Reserve Board, the balance of the loan to Grant, Inc., was charged off on the books, but it, of course, held Grant, Inc.'s, note and certain collateral represented by warehouse receipts, and invoices of goods bought for its Russian correspondence, but which, up to February, 1922, Grant, Inc., could not realize on or safely ship to the consignees in Russia.

The loan was renewed by the appellant, in response to the request of Grant, Inc., in the above letter, on February 7, 1921; again on May 9, 1921; again on August 8, 1921; and again on November 8, 1921, which brought its maturity on February 8, 1922.

Some time in 1919 and 1920 Grant, Inc., received from the appellee, M. A. Topas & Co., a consignment of wool subject to a lien thereon of the Russo-Asiatic Bank, which had loaned Topas & Co. funds secured by the lien on this consignment by depositing with the Russo-Asiatic Bank the "shipping documents." The wool, owing to the falling market, was not sold until January, 1922, for which Grant, Inc., received as factor $157,651.43. After deducting its commission and certain expenses, it had left in its hands approximately $150,000.

At this time Grant, Inc., which had had dealings with the Russo-Asiatic Bank over a period of years, and had a running account with it, claimed that the Russo-Asiatic Bank owed it a balance of approximately $107,000, which, under advice of counsel, it set off against the sum in its hands received from the sale of the wool consigned by Topas & Co. and had deposited the balance of $43,000 in a New York bank to the credit of the Russo-Asiatic Bank.

When the Russo-Asiatic Bank and Topas & Co. learned of the action of Grant, Inc., each immediately protested, and, in 1924, brought an action against Grant, Inc., to recover the balance of the proceeds of the wool, claiming it was held by Grant, Inc., as trust funds. The District Court for the Southern District of New York held that the rule applied that a set-off might be had against an alien when it could not as against a citizen, and dismissed the bill. On appeal, however, the Circuit Court of Appeals for the Second Circuit reversed the decree of the District Court and held that the rule as to set-off against aliens did not apply in this case; see Topas et al. v. John MacGregor Grant, Inc., 18 F.(2d) 724, 52 A. L. R. 807; and held that the funds in the hands of Grant, Inc., were trust funds for the benefit of Topas & Co. and the Russo-Asiatic Bank. Certiorari was denied by the Supreme Court. 274 U. S. 754, 47 S. Ct. 766, 71 L. Ed. 1334.

Following the application of its claim

against the Russo-Asiatic Bank in set-off, Grant, Inc., applied the funds to various obligations of the corporation, including payment of its indebtedness to the appellant. On February 8, 1922, the due date of its note, there was a telephone communication between Grant, Inc., and the appellant, relating to the interest due on the loan to February 9th, and the check of Grant, Inc., was sent to the appellant in full payment of the balance of its loan with interest, which was acknowledged, and its note and collateral forwarded to Grant, Inc.

On failing to realize against Grant, Inc., under the decree of the courts of New York, Topas & Co. and the Russo-Asiatic Bank brought this bill to follow the funds as charged with a trust in their favor into the hands of the appellant, on the ground that, its representative, Bolinger, being a director of Grant, Inc., and familiar with its financial condition, the appellant took the funds with, at least, sufficient knowledge to put it on inquiry, and, if it had inquired, it would have learned that they were funds received by Grant, Inc., as a factor, and the appellant therefore took no better title to the funds than Grant, Inc., acquired through its claimed right of set-off against an alien.

■ The only issue is one of fact, viz. whether upon the facts within the knowledge of Bolinger and the appellant it was put upon inquiry. We do not think the provisions of the Negotiable Instruments Law have any bearing on the situation. There is no issue here as to the title to the check, or any defense against it by the drawer or any indorser. The check was a binding obligation on Grant, Inc. It was paid by the drawee.

The situation is no different than if Grant, Inc., had paid its obligations to the appellant in cash. The question is whether a reasonably prudent man would have been put on inquiry as to the source of the funds.

■ The District Court held that the appellant's position was similar to that of a preferred creditor in bankruptcy by which we understand he meant that the appellant had reasonable cause to believe that the funds were not funds of Grant, Inc., and therefore should have inquired as to their source.

Bolinger and the appellant, it is true, knew of the large sums involved in the confiscations of Grant, Inc.'s, property by the Soviet government in 1917, and that the claim of Grant, Inc., could not be enforced until the United States recognized the Soviet government, and could only be realized through personal negotiations by the officials of Grant, Inc. Bolinger also knew that Grant, Inc., at the time of the payment and for a long time prior thereto, was insolvent; that it had been without funds to buy and sell on its own account, except on a small scale; and that its chief business was that of a factor or commission merchant; but neither Bolinger nor the appellant had any knowledge of the transaction with Topas & Co. and the Russo-Asiatic Bank.

At the same time, however, Bolinger also knew that since 1917 Grant, Inc., each year up to 1921 had realized out of its foreign business sufficient to reduce its loan with the appellant from $100,000 to $21,564.08, that in 1921 it was still anticipating further realization on its Russian business, and that the New York banks with knowledge of these conditions, and in view of Grant, Inc.'s, familiarity and contact with the Russian situation, had extended their loans.

Under the circumstances, the mere fact that he had knowledge of the peculiar political conditions that had resulted in the inability of Grant, Inc., to meet its obligations, and that under the conditions existing in 1921 it was unable to meet within thirty days a small claim of $445, was not sufficient, in view of the previous substantial payments it had been able to make since the Bolshevik revolution, to put the appellant on inquiry as to the source of the funds from which its loan was paid. It was, on the other hand, fairly warranted in assuming from the fact that Grant, Inc., had already realized from its foreign business approximately $80,000 within three and one half years, that a further realization had eventuated in accordance with the anticipation expressed in its letter of January 19, 1921, following which the appellant had extended its loan. The appellant was not charged from the knowledge in the possession of Bolinger with believing that a wrongful appropriation of trust funds had been made. He had no knowledge of the source from which the funds were obtained. Knowledge of facts that would put a creditor on inquiry as to whether a preference would result from accepting funds from an insolvent debtor is not necessarily sufficient to put a creditor on inquiry as to a wrongful appropriation of funds by a debtor in order to pay a loan. It requires more substantial facts to create a presumption of wrongful acts than of acts that may be perfectly lawful, though voidable in bankruptcy. Nor are the facts in this case parallel with those in the case of Union Stock-Yards Nat. Bank

v. Gillespie, 137 U. S. 411, 11 S. Ct. 118, 34 L. Ed. 724. There a bank appropriated a deposit which it knew the depositor had obtained as a factor, and that it was derived from a certain transaction. The court there expressly refused to pass on the question involved in the present case. In the present case Grant, Inc., had other possible sources of obtaining large sums of money from which it could and had reduced its indebtedness to the appellant from $100,000 to $21,564.08, and within a reasonable time in view of all the circumstances.

The decree of the District Court is reversed, and a decree may be entered dismissing the bill of complainants, with costs in both courts.